FILED
United States Court of Appeals
Tenth Circuit

July 26, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

FIDELITY NATIONAL TITLE
INSURANCE COMPANY, a California
corporation,

      Plaintiff Counter Defendant -
Appellee,

v.

WOODY CREEK VENTURES, LLC, a
Colorado limited liability company,

      Defendant Counterclaimant -
Appellant,

and

PITKIN COUNTY TITLE, INC., a
Colorado corporation,

      Defendant.

No. 14-1274

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:13-CV-01289-RBJ)**
_____

Eric E. Torgersen (Dennis B. Polk, and Melissa R. Liff, with him on the briefs), Holley, Albertson & Polk, P.C., Lakewood, Colorado, for Defendant Counterclaimant-Appellant.

Adam P. O'Brien (Marilyn S. Chappell, with him on the brief), Wells, Anderson & Race, LLC, Denver, Colorado, for Plaintiff Counter Defendant-Appellee.
_____

Before **HARTZ**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.
_____

This suit requires us to interpret two provisions of a title insurance policy underwritten by Fidelity National Title Insurance Company—one provision insures against unmarketability of title and the other insures against a lack of access to property. The owner of the policy, Woody Creek Ventures, LLC, contends that both provisions covered losses it sustained when it learned, after purchasing two parcels of land, that one parcel lacked permanent access. And although Fidelity obtained a 30-year right-of-way grant to that parcel, Woody Creek maintains Fidelity failed to cure the lack of access and the title remained unmarketable. Because we agree with the district court's conclusions that (1) the policy doesn't insure a permanent right of access, (2) the right-of-way cured the lack of access to the parcel, and (3) the lack of permanent access doesn't render Woody Creek's title unmarketable, we affirm.

### BACKGROUND

Woody Creek acquired two parcels of land in Pitkin County and purchased a title insurance policy from Fidelity.[1] Although the two parcels are separated by a tract of land owned by the Bureau of Land Management (BLM), Woody Creek assumed, when it acquired the two parcels, that it had a legal right to access the more remote of the two parcels via Discovery Way—a roadway crossing BLM's tract of land. Woody Creek later subdivided the remote parcel into several lots. When a prospective buyer

_____

[1] Pitkin County Title, Inc. issued the policy; Fidelity underwrote it.

2

of a subdivided lot expressed concerns about access to the property, Woody Creek discovered it had no legal right of access to that lot via Discovery Way. Woody Creek submitted a claim to Fidelity, alleging that the lack of a legal right of access diminished the value of the remote parcel by $7 million. Before the parties could resolve the claim, Woody Creek's prospective buyer backed out of the sale.

Meanwhile, Fidelity retained counsel on Woody Creek's behalf, and counsel initiated a quiet title action against BLM to obtain an easement over Discovery Way. Counsel ultimately dismissed the quiet title action after negotiating Fidelity's purchase from BLM of a 30-year revocable right-of-way grant. The right-of-way grant allows Woody Creek to access the remote parcel via Discovery Way.[2] Notwithstanding the right-of-way grant, Woody Creek maintained that it suffered a covered loss because the lack of permanent, irrevocable access significantly diminished the value of the remote parcel.[3]

---

[2] BLM granted the right-of-way over Discovery Way pursuant to Title V of the Federal Land Policy and Management Act, 43 U.S.C. §§ 1761-1771. The right-of-way grant continues until "December 31, 2041, unless, prior thereto, it is renewed, relinquished, abandoned, terminated, or modified pursuant to the terms and conditions of this instrument or of any applicable Federal law or regulation." App. 226. If renewed, it is "subject to the regulations existing at the time of renewal and any other terms and conditions that the authorized officer deems necessary to protect the public interest." *Id.* The right-of-way grant requires the holder to pay BLM "fair market value rental," *id.* at 227, and Fidelity paid the rental fee. The grant also is subject to certain terms and conditions, including (1) suspension or termination in case of the holder's "[f]ailure . . . to comply with applicable law or any provision of this right-of-way grant," and (2) specific limits and prohibitions on activities that may be conducted on the right-of-way. *Id.*

[3] It appears that although Fidelity recognizes its obligation to ensure the right-of-way to Woody Creek as long as Woody Creek owns the property, that obligation doesn't extend to any subsequent purchasers of Woody Creek's property.

Fidelity filed this action seeking a judgment declaring that Woody Creek wasn't entitled to coverage for its alleged losses under the title policy because the right-of-way grant cured the access issue.[4] Woody Creek counterclaimed for declaratory judgment on the existence of coverage, breach of contract, and bad faith breach of insurance contract. The parties filed cross-motions for partial summary judgment on the coverage issues (existence of coverage, applicability of exceptions and exclusions, and apportionment). Fidelity also moved for partial summary judgment on Woody Creek's counterclaims for breach of contract and bad faith denial of coverage. Woody Creek opposed summary judgment on the bad-faith-denial-of-coverage claim.

After a hearing, the district court granted Fidelity's motion and denied Woody Creek's. The district court concluded that the 30-year right-of-way fell within "the plain, unambiguous meaning of 'a right of access'" in the policy and that whether "Fidelity may be obligated to pay money or cure a lack of access in the future if Woody Creek ever loses that access . . . is a question for another day." App. 366. The court further concluded that the possibility of future litigation regarding the right of access didn't render title unmarketable. Finally, the court rejected as a matter of law

---

[4] Fidelity also sought declaratory relief against (1) both Woody Creek and Pitkin Exchange, Inc. (the holder of a related lender's title insurance policy issued by Pitkin County Title, Inc.), claiming applicability of policy exceptions and exclusions; (2) Woody Creek for apportionment if liability and damages were found; and (3) Pitkin County Title, Inc., claiming indemnity. Fidelity also alleged breach of contract and negligence claims against Pitkin County Title, Inc. Fidelity later dismissed without prejudice its claims against Pitkin Exchange, Inc.

Woody Creek's bad-faith-denial-of-coverage claim because Fidelity never denied

coverage.[5] Woody Creek appeals.

## DISCUSSION

We apply the same legal standards as the district court when we review a

district court's grant of partial summary judgment de novo. *Qwest Corp. v. AT&T

Corp.*, 479 F.3d 1206, 1209 (10th Cir. 2007). Summary judgment is appropriate if

"there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).

The parties agree that Colorado law applies in this diversity jurisdiction case.

And in Colorado, the construction of an insurance policy involves a question of law

subject to de novo review. *First Fed. Sav. & Loan Ass'n of Fargo v. Transamerica

Title Ins. Co.*, 19 F.3d 528, 530 (10th Cir. 1994).

Woody Creek contends it has suffered covered losses under its title insurance

policy because (1) it lacks a right of access to and from the remote parcel and (2) that

lack of access renders its title to the parcel unmarketable.

The title insurance policy at issue here provides, in part, that subject to

identified exclusions, exceptions, conditions, and stipulations, Fidelity

> [i]nsures, as of Date of Policy shown in Schedule A, against loss or
> damage, not exceeding the Amount of Insurance shown in Schedule A,
> sustained or incurred by the insured by reason of:
>
> 1. Title to the estate or interest herein described in Schedule A being vested
> other than as stated herein;

---

[5] Based on its resolution of the coverage issue, the district court did not
address the arguments regarding policy exceptions and exclusions or apportionment.

2. Any defect in or lien or encumbrance on the title;

3. Unmarketability of the title;

4. Lack of a right of access to and from the land.

App. 278.

The policy specifically permits Fidelity to cure a lack of a right of access to and from the property and to cure unmarketability of title, and further provides that having done so in a reasonably diligent manner, Fidelity "shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby." App. 287. Thus, the parties agree Fidelity is liable under the policy only if the revocable right-of-way failed to cure (1) the lack of a right of access to the remote parcel or (2) unmarketability of the title.

## I.     Fidelity cured Woody Creek's lack of a right of access to the remote parcel by obtaining the 30-year revocable right-of-way grant.

Woody Creek argues the right-of-way grant doesn't provide a right of access to the remote parcel because the grant is revocable and temporary. Woody Creek urges us to construe the policy language insuring against a lack of a right of access broadly in its favor to conform to Woody Creek's objectively reasonable expectation that right of access means a permanent, irrevocable legal right of access.

Fidelity concedes that the plain language of the policy covers a right of access, but contends it doesn't guarantee unrestricted, unregulated, or permanent access. Fidelity argues it cured Woody Creek's lack of access because the right-of-way grant provides the right of access the policy contemplates.

6

Woody Creek bears the initial burden of demonstrating that coverage of its claim falls within the policy language. *See Rodriguez ex rel. Rodriguez v. Safeco Ins. Co. of Am.*, 821 P.2d 849, 853 (Colo. App. 1991). The policy doesn't define the phrase "right of access," and we've found no controlling Colorado case law interpreting its meaning in a title insurance policy. Therefore, we must predict how the Colorado Supreme Court would construe the phrase "right of access" within the meaning of a title insurance policy. *See, e.g.*, *Squires v. Breckenridge Outdoor Educ. Ctr.*, 715 F.3d 867, 875 (10th Cir. 2013).[6]

In interpreting insurance policies, Colorado courts "construe the plain language of the contract to effectuate the intent of the parties, and . . . resolve ambiguities in favor of the insured." *Radil v. Nat'l Union Fire Ins. Co. of Pittsburg*, 233 P.3d 688, 692 (Colo. 2010). "The words of the contract should be given their plain meaning according to common usage, and strained constructions should be avoided." *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002). The Colorado Supreme Court generally relies on case law from other jurisdictions and recognized dictionary definitions to establish the plain and ordinary meaning of undefined terms in an insurance contract. *See, e.g.*, *Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1091 (Colo. 1991).

---

[6] Woody Creek contends that this appeal involves matters of first impression in Colorado and moves us to certify four questions of law to the Colorado Supreme Court rather than predict how that court would rule. *See* 10th Cir. R. 27.2(A). Because we find sufficient guidance in existing case law, we deny Woody Creek's motion.

7

Other jurisdictions have narrowly and literally construed right-of-access provisions in title insurance policies, finding a right of access even when the insured lacks a practical, physical means of access to the property or when the insured lacks an established means of access in the particular legal form the insured desires. *See, e.g.*, *James v. Chi. Title Ins. Co.*, 339 P.3d 420, 422-24 (Mont. 2014) (concluding insureds had no claim against title company for lack of right of access when they received no surveyed and platted right of way, only an undefined nonexclusive-access easement based on recorded declaration of easements); *43 Park Owners Grp., LLC v. Commonwealth Land Title Ins. Co.*, 995 N.Y.S.2d 148, 150 (N.Y. App. Div. 2014) (holding insureds had legal right of access when their property abutted street but retaining wall blocked physical access to that street); *Haines v. Old Republic Nat'l Title Ins. Co.*, 178 P.3d 1086, 1090-91 (Wyo. 2008) (rejecting insured's claims of coverage under right of access and unmarketability of title provisions when insured had legal right of access over road made public through common-law estoppel theory and also had two other means of access, both of which lacked recorded legal access); *Hulse v. First Am. Title Co. of Crook Cty.*, 33 P.3d 122, 131, 138 (Wyo. 2001) (concluding insured's access through "'unpassable' vacated private road" satisfied requirement of legal right of access even if road's physical condition didn't satisfy insureds); *Gates v. Chi. Title Ins. Co.*, 813 S.W.2d 10, 11-12 (Mo. Ct. App. 1991) (per curiam) (finding insured had right of access to property by way of "goat path" safely accessible only on foot or horseback).

None of these cases directly address whether a 30-year revocable right-of-way grant constitutes a right of access as contemplated in a title insurance policy. But these authorities do establish that most courts don't read the phrase "right of access" as requiring any particular type of physical or legal access. The district court's determination here that the right-of-way grant provides Woody Creek with a right of access as contemplated by the plain language of the policy is consistent with these decisions.

Moreover, the district court's determination corresponds with the plain and ordinary meanings of the terms "right" and "access." *See, e.g.*, *Right*, Black's Law Dictionary (10th ed. 2014) (def'n 5) ("The interest, claim, or ownership that one has in tangible or intangible property"); *Access*, Black's Law Dictionary (10th ed. 2014) ("A right, opportunity, or ability to enter, approach, pass to and from, or communicate with").

And, although Colorado courts have not considered whether a right-of-way grant constitutes a right of access within the meaning of a title insurance policy, they have construed a right-of-way grant as a form of an easement that provides certain property rights to the grantee. *See, e.g.*, *Hutson v. Agric. Ditch & Reservoir Co.*, 723 P.2d 736, 739 (Colo. 1986) (explaining, "In the absence of additional descriptive language, 'right-of-way,' when used to describe an ownership interest in real property, is traditionally construed to be an easement"); *Barnard v. Gaumer*, 361 P.2d 778, 780 (Colo. 1961) (en banc) (reiterating that "an easement is a right conferred by grant or acquired by prescription, authorizing one to do or maintain

9

something on the land of another"); *see also Lincoln Sav. & Loan Ass'n v. State*, 768 P.2d 733, 735 (Colo. App. 1988) (stating that "deeds which in the granting clause convey a right-of-way over, across, or upon certain lands devolve a right only, and are generally construed as creating an easement").

The Colorado Supreme Court's understanding of a right-of-way grant is consistent with the plain and ordinary meanings of the individual terms "right" and "access." Consequently, we think the Colorado Supreme Court would determine that a long-term, revocable right-of-way grant—like the one that provides Woody Creek a right to enter and pass through BLM land to access the remote parcel—constitutes a "right of access" as that phrase is used in the title insurance policy.

Finally, although Woody Creek asserts that it reasonably expected the phrase "right of access" to mean a permanent right of access, that expectation doesn't defeat the plain and ordinary meaning of unambiguous policy language. *See Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1054 (Colo. 2011) (explaining that "the doctrine of reasonable expectations 'does not contemplate the expansion of coverage on a general equitable basis,'" and that "[t]he 'bare allegations' of policyholders that they expected certain coverage are insufficient to establish grounds for relief sounding in reasonable expectations" (quoting *Johnson v. Farm Bureau Mut. Ins. Co.*, 533 N.W.2d 203, 206 (Iowa 1995))); *see also Riordan v. Lawyers Title Ins.*

10

*Corp.*, 393 F. Supp. 2d 1100, 1104 (D.N.M. 2005) (stating that "[t]he doctrine of reasonable expectations only applies where the policy terms are ambiguous").[7]

Because Woody Creek fails to demonstrate that the right of access Fidelity insured is satisfied only if Woody Creek has permanent, irrevocable access to the remote parcel, we conclude Fidelity cured Woody Creek's lack of access and that Woody Creek has no current covered claim under the policy's right-of-access provision. Thus, we affirm the district court's grant of summary judgment in favor of Fidelity and its denial of Woody Creek's motion on this issue.

**II.     The lack of a permanent, irrevocable right of access to and from the remote parcel doesn't support Woody Creek's claim for unmarketability of title.**

---

[7] Woody Creek argues that in granting Fidelity's motion for summary judgment on the lack of access issue, the district court improperly disregarded an affidavit from Willis Carpenter, an attorney specializing in Colorado real estate and title insurance law. Carpenter opined that "[r]ight of access means a legally enforceable permanent right of access," and that "[b]ased on customs and practices in the insurance industry, it is unreasonable to deny a claim based on a lack of a right of access in reliance on a license, easement, or right of way that is revocable." App. 265-66. The district court observed that Carpenter's affidavit contained statements that not only contradicted Carpenter's own statements in a treatise on Colorado real estate practice, but also concerned the ultimate legal issue to be determined by the district court—the interpretation of the phrase "right of access." App. 362-63. Woody Creek argues the district court not only impermissibly considered Carpenter's credibility at the summary judgment stage, *see, e.g.*, *Abilene Retail #30, Inc. v. Bd. of Comm'rs*, 492 F.3d 1164, 1188 (10th Cir. 2007), but also mischaracterized Carpenter's unrebutted testimony as a legal conclusion rather than an opinion of fact. Regardless of whether the district court improperly opined on Carpenter's credibility, we agree with the district court that the conclusory allegations in Carpenter's affidavit were insufficient to create a genuine issue of material fact precluding summary judgment. *See, e.g.*, *Martinez v. CO2 Servs., Inc.*, 12 F. App'x 689, 694-95 (10th Cir. 2001) (unpublished) (holding that a conclusory affidavit from an expert witness is insufficient to defeat summary judgment).

11

Next, Woody Creek argues the lack of a permanent and unrestricted right of access to and from the remote parcel renders its title unmarketable and supports its claim for a covered loss under the policy's "unmarketability of the title" provision. Woody Creek explains that it subdivided the remote parcel into 10 lots and that it discovered the access issue during contract negotiations for the sale of one subdivided lot. Woody Creek points out that by the time Fidelity filed the quiet title action to obtain access to the remote parcel, "the contract for the sale of [that lot] had been terminated." App. 316. Woody Creek further maintains that even after Fidelity obtained the 30-year right-of-way grant, Woody Creek hasn't been able to sell any of the lots on the remote parcel "due to the lack of permanent access." *Id.* In support of its unmarketability argument, Woody Creek equates the lack of permanent access to a complete lack of access and cites a legal treatise for the proposition that "[t]he majority rule is that lack of access makes title unmarketable." Aplt. Br. 37-38. *See* 1 Palomar, *Title Ins. Law* § 5.8 (2015) (citing four state cases for "majority rule").

Fidelity, on the other hand, argues that the lack of permanent access doesn't trigger coverage under the policy's "unmarketability of the title" provision. Fidelity questions Woody Creek's reliance on the "majority rule," and suggests that three Colorado cases generally support its position that even a complete lack of access doesn't render title unmarketable in Colorado: *Edwards v. St. Paul Title Insurance Co.*, 563 P.2d 979 (Colo. App. 1977); *Campbell v. Summit Plaza Associates*, 192 P.3d 465 (Colo. App. 2008); and *Knight v. Devonshire Co.*, 736 P.2d 1223 (Colo. App. 1986). Additionally, Fidelity points out that at least one other jurisdiction

12

narrowly construes the phrase "unmarketability of the title" in title insurance policies to relate to title defects affecting legally recognized incidents of ownership rather than defects in physical conditions—like a lack of access—that affect the use of the land.

As we've noted, Woody Creek bears the burden of demonstrating that coverage of its claim falls within the policy language. *See Rodriguez*, 821 P.2d at 853. The policy defines the phrase "unmarketability of the title" as "an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest . . . to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title." App. 286.

Colorado courts haven't considered whether the lack of a right of access to property constitutes an alleged or apparent matter affecting the title to the land that would render a title unmarketable. But the three Colorado Court of Appeals cases Fidelity relies on provide guidance as to what renders a title unmarketable in other contexts.

For example, in *Edwards*, the insured claimed that the insurer was liable under a title insurance policy's unmarketability of title provision for damages arising from the diminution in property value caused by his property's inclusion within a water and sanitation district and his consequent exposure to assessment for district taxes. 563 P.2d at 980-81. The *Edwards* court concluded that the property's inclusion in the water and sanitation district didn't render the insured's title unmarketable, reasoning

13

that while "[t]he [v]alue of the property [was] undoubtedly affected by the amount of the district taxes, . . . this ha[d] nothing to do with the title to the property and the [m]arketability of the title." *Id.* The *Edwards* court explained,

> To be marketable, the title must be such as to make it reasonably certain that it will not be called into question in the future so as to subject the purchaser to the hazard of litigation with reference thereto. Here, except for the lien of [the plaintiff's] own purchase money deed of trust, there is nothing in the record to show any foreseeable challenge to [the plaintiff's] title to, or his right to possession and quiet enjoyment of, all of his property. Also, in no way has any of his land been reduced in size or in use.

563 P.2d at 980-81 (internal citations, alterations, and quotation marks omitted). *Cf. Hedgecock v. Stewart Title Guar. Co.*, 676 P.2d 1208, 1210 (Colo. App. 1983) (finding insurer liable for damages due to unmarketability of title because the legal description of the property in the title and the insurance policy could not be reconciled with the actual location of the property), *abrogated on other grounds as stated in First Citizens Bank & Trust v. Stewart Title Guar. Co.*, 320 P.3d 406, 413-14 (Colo. App. 2014).

Likewise, in resolving a breach of warranty dispute between a purchaser and vendor, the Colorado Court of Appeals rejected the district court's conclusion that the vendor breached the covenant against encumbrances in a general warranty deed when it conveyed a landlocked parcel of property to the purchaser. *Campbell*, 192 P.3d at 468, 475. The *Campbell* court relied, in part, on two cases from other jurisdictions rejecting the notion that a lack of access renders a title unmarketable. *See id.* at 474-75 (discussing *Mostrong v. Jackson*, 866 P.2d 573 (Utah App. 1993), and *Sinks v. Karleskint*, 474 N.E.2d 767 (Ill. App. Ct. 1985)). Notably, the *Campbell*

14

court concluded that the lack of access to real property doesn't constitute an "encumbrance" in a general warranty deed because the lack of access isn't the kind of title defect that would defeat the purchasers' right to possession. *Id.* at 475.[8]

Finally, in *Knight*, the Colorado Court of Appeals considered whether a reservation of mineral lands in an 1883 patent constituted a defect that rendered title to the property "unmerchantable." 736 P.2d at 1224. The *Knight* court applied the presumption that reservations or exceptions of mineral rights "constitute a sufficient defect in title, or encumbrance, to render a seller's title unmarketable." *Id.* But the court identified the ultimate issue as whether the title in question was merchantable. The *Knight* court explained that merchantable or marketable title in real estate means a title that is "reasonably free from such doubts as will affect the market value of the estate; one which a reasonably prudent person with knowledge of all the facts and their legal bearing would be willing to accept." *Id.* at 1225 (quoting *Fed. Farm Mortg. Corp. v. Schmidt*, 126 P.2d 1036, 1038 (Colo. 1942)).

The *Knight* court further characterized a marketable title as one that is "reasonably certain [not to] be called into question in the future so as to subject the purchaser to the hazard of litigation." *Id.* Thus, the court concluded that when "no reasonably foreseeable challenge to title or to the right of possession and quiet enjoyment of the property can be demonstrated, [the] title will be determined to be

---

[8] Woody Creek suggests *Campbell* is distinguishable because there, the court didn't interpret a title insurance policy. We disagree. Although *Campbell* concerned a covenant against encumbrances rather than a title insurance policy provision, *Campbell*'s rationale is persuasive here.

15

marketable." *Id.* Ultimately, the *Knight* court perceived no foreseeable, or even remote, possibility of litigation based on the patent's purported reservation of mineral rights. Thus, the court held that the trial court erred in concluding that the possibility of litigation concerning the reserved mineral rights rendered the seller's title unmarketable. *Id.* at 1226.

We read these cases as strongly supporting Fidelity's position that a lack of legal access to property isn't the type of defect that renders a title unmarketable. Significantly, while both *Edwards* and *Knight* suggest that the hazard of future litigation might affect marketability, both cases also employ limiting language to explain that the litigation referred to involves challenges affecting the right of possession and quiet enjoyment of the property. This limitation is consistent with the majority view, which "emphasize[s] the differences between marketability of title and marketability of land." *See First United, Inc. v. Chi. Title Ins. Co.*, 237 S.W.3d 15, 19 (Ark. 2006) (quoting *Powell on Real Property*, § 92.05). In other words,

> [t]he fact that a given property suffers from 'economic' lack of marketability, which relates to physical conditions affecting the use of the property or other non-title matters, is not relevant to title insurance coverage. In essence, defects which merely diminish the value of the property, as opposed to defects which adversely affect a clear title to the property, will not render title unmarketable within the meaning and coverage of a policy insuring against unmarketable title. This is often expressed by the principle that one can hold perfect title to land that is valueless and one can have "marketable title" to land while the land itself is unmarketable.

11 Couch on Insurance § 159:7 (3d ed. Supp. 2015). *See also id.* § 159:59 (explaining that "[t]he ability to access a parcel of real estate can obviously affect the

16

marketability of the property in terms of how much a buyer would pay for it, but it is not technically a 'defect' in the title to the property").

Notably, in *Edwards* the Colorado Court of Appeals specifically recognized the distinction between economic marketability and marketability of title, reasoning, "The [v]alue of the property is undoubtedly affected by the amount of the district taxes, but this has nothing to do with the title to the property and the [m]arketability of the title." 563 P.2d at 980. *Accord Sonnett v. First Am. Title Ins. Co.*, 309 P.3d 799, 806 (Wyo. 2013) ("An individual can hold clear title to a parcel of land, although the same parcel is valueless or considered economically unmarketable because of some restriction or regulation on its use." (quoting *Bear Fritz Land Co. v. Kachemak Bay Title Agency, Inc.*, 920 P.2d 759, 762-63 (Alaska 1996))); *Dusenbery v. Jones*, 359 F. Supp. 712, 716-19 (D. Kan. 1972) (noting that while an access restriction might lessen a property's value, it doesn't necessarily render the title unmarketable; stating that "[t]he thrust of the law as it relates to marketability is directed towards the certainty or uncertainty of the vendor's title, not to the value of the property to the purchaser").

Moreover, like the Colorado Court of Appeals, other jurisdictions have also recognized and applied this distinction in various contexts. *See, e.g.*, *McGonagle v. Stewart Title Guar. Co.*, 432 S.W.3d 535, 540 (Tex. App. 2014) (concluding that dedication instrument imposing certain conditions on plaintiffs' use of their property burdened the land but didn't affect plaintiffs' ownership interests and therefore didn't render title unmarketable); *Trinder v. Conn. Att'ys Title Ins. Co.*, 22 A.3d 493, 498-

17

99 (Vt. 2011) (concluding partial encroachment of homeowners' septic tank on museum's land and potential that museum might seek its removal in future didn't implicate homeowners' title or support coverage for unmarketability of title); *Chi. Title Ins. Co. v. Investguard, Ltd.*, 449 S.E.2d 681, 682-83 (Ga. Ct. App. 1994) (collecting cases and concluding property's location in flood plain may have affected economic marketability but didn't affect marketability of title); *Chi. Title Ins. Co. v. Kumar*, 506 N.E.2d 154, 156-57 (Mass. App. Ct. 1987) (concluding that possibility of future lien and potential liability for cleanup arising from existence of underground hazardous waste on property "relate[d] to physical conditions affecting" use of property and "may affect market value of the defendant's land," but weren't title defects and thus didn't render title unmarketable).

And, as Fidelity points out, at least one jurisdiction has applied the distinction between economic marketability and title marketability in the lack-of-access context. In *Riordan*, 393 F. Supp. 2d 1100, the plaintiffs sought coverage under the same two title insurance policy provisions at issue in this case, arguing that the policy's "right of access" provision insured a right of vehicular access to their remote property, which was surrounded by national forest. *Id.* at 1102, 1104. The district court rejected that argument, concluding "that coverage for a 'lack of right of access' to the insured property is not triggered where access is merely impractical or difficult as long as the right to access exists." *Id.* at 1104.

The district court in *Riordan* similarly disposed of the plaintiffs' related claim that the lack of vehicular access rendered their title unmarketable. The court

18

recognized a distinction between "economic lack of marketability, which relates to physical conditions affecting the use of the property, and title marketability, which relates to defects affecting legally recognized rights and incidents of ownership." *Id.* at 1105. The court reasoned that because the plaintiffs had a right of access to the property at all relevant times and successfully sold their property, albeit for less than the appraised value, they failed to demonstrate that the lack of vehicular access rendered their title unmarketable. *Id.*

As we've discussed, Fidelity's procurement of a 30-year right-of-way provided Woody Creek with a right of access to the remote parcel even if it wasn't the type of access Woody Creek desired. In essence, Woody Creek's complaint here is that the lack of *permanent* access lessens the economic marketability of its property. But the weight of authority recognizes that a lack of economic marketability doesn't equate to nonmarketable title.

To summarize, we predict the Colorado Supreme Court would construe the phrase "unmarketability of the title" in the title insurance policy at issue here to relate to defects affecting rights of ownership—i.e., defects in title—rather than defects affecting the physical condition or use of the covered property. We base that prediction on (1) the plain language of the policy defining the phrase "unmarketability of the title" with reference to "matter[s] affecting the title to the land," App. 286, (2) Colorado case law construing marketability of title in other contexts and recognizing a distinction between economic marketability and marketability of title, and (3) the weight of authority making that same distinction.

19

Because Woody Creek doesn't contend its lack of permanent, unrestricted access to the remote parcel has affected its rights of ownership, we affirm the district court's decision that the lack of such access doesn't render Woody Creek's title unmarketable.

Affirmed.