2018 UT App 58

## THE UTAH COURT OF APPEALS

BRUCE W. LAURITZEN,
Appellant,
*v.*
FIRST AMERICAN TITLE INSURANCE COMPANY,
Appellee.

Opinion
No. 20160717-CA
Filed April 5, 2018

Fifth District Court, St. George Department
The Honorable James L. Shumate
No. 120500181

Karra J. Porter and J.D. Lauritzen, Attorneys
for Appellant

Ronald G. Russell, Royce B. Covington, and Jeffery
A. Balls Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
GREGORY K. ORME and DIANA HAGEN concurred.

HARRIS, Judge:

¶1     Bruce W. Lauritzen purchased five lots of undeveloped real property in Hurricane, Utah based on a description in a recorded subdivision plat map. Lauritzen then purchased title insurance for these lots through First American Title Insurance Company (First American). Subsequently, Lauritzen learned that the plat map had a material defect: one of his lots partially overlapped with another parcel. Eventually, the plat was amended by shrinking the overlapping lot and by imposing additional development requirements on all of Lauritzen's lots. Lauritzen then made a claim on his title insurance policy, and filed this lawsuit after First American denied his claim. Eventually, the district court granted summary judgment to First

American on all of Lauritzen's claims, and Lauritzen appeals. We affirm the bulk of the district court's ruling, but reverse the district court's decision to the extent it determined that no insurance coverage exists for damages caused by the lot overlap, and we remand for further proceedings.

BACKGROUND

¶2     On April 2, 2007, the Sunset Ridge Phase 3 Subdivision Plat map (the Original Plat) was recorded with the Washington County Recorder's Office. At some point soon thereafter, the Washington County Recorder's Office issued a notice that the Original Plat was defective because at least one of the lots (Lot 54) depicted on the Original Plat overlapped with an adjacent parcel of land.

¶3     Later, on April 19, 2007, several lots depicted on the Original Plat were conveyed to a holding company (the Company) via warranty deed. The deed did not contain a metes and bounds description of the lots, but instead referred to the Original Plat, indicating that the lots were being conveyed as they were represented "according to the official plat thereof, recorded in the office of the Washington County Recorder." On June 7, 2007, Lauritzen purchased five lots (the Lots) from the Company, which conveyed the Lots to him by a warranty deed. Lauritzen's deed also did not describe the metes and bounds of the Lots, but instead conveyed "Lot 54, 64, 76, 77 & 80, Sunset Ridge Phase 3, according to the official plat thereof recorded in the office of the Washington County Recorder."

¶4     After acquiring the Lots, Lauritzen purchased title insurance from First American, effective April 19, 2007. The insurance policy (the Policy), in pertinent part, insured Lauritzen against loss or damage incurred by reason of "[a]ny defect in or lien or encumbrance on the title; [or] . . . [u]nmarketability of the title" to the Lots.

¶5     Sometime in 2008, Lauritzen learned that the Washington County Recorder's Office had rejected the Original Plat due to the presence of the overlap, and that "consent" would be required before development in the subdivision could proceed.[1] Indeed, because of the issues with the Original Plat, Hurricane municipal authorities refused to issue Lauritzen building permits for the Lots. After discovering the problem, Lauritzen contacted one of First American's insurance agents to obtain a copy of the Policy, and to see what needed to be done to rectify the problem with the plat. On one occasion, Lauritzen met in person with First American's agent, who assured Lauritzen that the problem would soon be resolved.

¶6     Eventually, a solution was reached that required making Lot 54 slightly smaller (by approximately 344 square feet) than it had been on the Original Plat. In addition, the solution included new setback requirements and restrictions on construction— none of which were included in the Original Plat—that affected all of Lauritzen's Lots. All of the affected landowners, including Lauritzen, eventually gave their consent to a new plat map (the Amended Plat) that reflected these changes, and in September 2008 the Amended Plat was recorded with the Washington County Recorder's Office.

¶7     On August 14, 2009, Lauritzen made a claim with First American alleging that the title to the Lots conveyed to him by the warranty deed was defective and unmarketable. First American denied the claim, and Lauritzen then filed this lawsuit against First American, alleging that there was a defect in his title to the Lots and seeking damages from First American pursuant to the Policy. As the litigation progressed, Lauritzen asserted that he had been damaged because: (1) the change from

---

1. The record does not disclose any details about whose consent (other than Lauritzen's) was required, although it does reveal that both (a) Lauritzen eventually consented to the Amended Plat and (b) all required consents were eventually obtained.

the Original Plat to the Amended Plat had decreased Lot 54 in size; (2) Lauritzen had been unable to receive a building permit on any of his lots until the Amended Plat was recorded; (3) the new setback and construction requirements that applied to all of the Lots had depressed their value; and (4) all of the Lots had been valueless for the period of time prior to the approval of the Amended Plat.

¶8 Eventually, both parties moved for summary judgment. In its motion, First American argued that it was entitled to judgment as a matter of law on several grounds. First, it argued that the Original Plat was merely a descriptive tool and was not a part of the warranty deed initially conveying the lots to Lauritzen. Second, First American argued that Lauritzen's title to the Lots was not unmarketable. Third, First American argued that Lauritzen's claim was not timely and that First American was thus absolved of any potential liability. Fourth, First American argued that Lauritzen had not proven any damages. The district court denied Lauritzen's motion and granted First American's.[2] Lauritzen appeals the district court's grant of First American's motion.

---

2. After briefing and oral argument, the district court took the motions under advisement. A few weeks later, the district court issued a brief, two-line memorandum decision stating simply that Lauritzen's motion was denied and that First American's motion was granted. The district court's ruling included no explanation of the reasons or grounds for its decision. Had this type of an order been issued by a district court in certain other contexts (for instance, where the court is obligated to make findings of fact on an issue), we would not hesitate to simply remand the case for the district court to explain its reasoning. We decline to do so here, however, because we may affirm a district court's decision on any ground apparent from the record, *see Bailey v. Bayles*, 2002 UT 58, ¶ 13, 52 P.3d 1158, and because our standard of review, when reviewing a district court's summary

(continued…)

ISSUE AND STANDARD OF REVIEW

¶9     Lauritzen raises one issue on appeal: whether the district court erred in granting summary judgment for First American. A district court "shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). We review a district court's summary judgment ruling for correctness. *Fire Ins. Exch. v. Oltmanns*, 2018 UT 10, ¶ 7.

ANALYSIS

I. Coverage under the Title Insurance Policy

¶10     The first matter that we must address is whether, and to what extent, there is coverage under the terms of the Policy for the events described in Lauritzen's complaint. Pursuant to the terms of the Policy, First American insured Lauritzen against loss or damage incurred by reason of "[a]ny defect in or lien or encumbrance on the title; [or] . . . [u]nmarketability of the title" to the Lots. Lauritzen asserts that both of these phrases are implicated in this case and provide the basis for a determination that coverage exists. Lauritzen argues that the title to all of the Lots was "unmarketable" because, at the time the warranty deed was executed, the Original Plat had been rejected and the Amended Plat placed new restrictions on the Lots. Lauritzen also argues that title to all of the Lots was "defective" because the description of Lot 54 in the Original Plat overlapped with another piece of property. We address each of these arguments in turn.

---

(…continued)
judgment ruling, is de novo. However, our review in this case would have benefitted from an explanation of the district court's reasoning, and we encourage trial judges, even in the summary judgment context, to explain the reasoning for their decisions.

A.     Marketability of Title

¶11    Lauritzen argues that there is coverage under the Policy because he sustained losses as the result of the "unmarketability" of the title he received by way of the warranty deed. Here, Lauritzen asserts that his title to all of the Lots was unmarketable because, during the time period prior to the recording of the Amended Plat, he could not obtain a building permit for any of the Lots, and because, even after the recording of the Amended Plat, his property was subject to added setback requirements and other development restrictions, limiting his ability to use them. Lauritzen asserts that, as a "reasonable purchaser," he would not have purchased the Lots had he known in advance about these issues and therefore his title is "unmarketable." The district court correctly rejected this argument, at least with respect to all issues other than the Lot 54 overlap, because Lauritzen espouses too broad an understanding of the meaning of "unmarketability" of title.

¶12    When determining the scope of coverage under an insurance contract, our starting point is the language of the Policy itself. *See, e.g., Quaid v. U.S. Healthcare, Inc.*, 2007 UT 27, ¶ 10, 158 P.3d 525. The Policy insures Lauritzen "against loss or damage . . . sustained or incurred . . . by reason of . . . [u]nmarketability of the title." The Policy contains an internal definition of "unmarketability of title," as follows: "an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the [property] . . . to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title." Thus, both the phrase itself—"marketability of title"—as well as its definition—"an alleged or apparent matter affecting the title to the land"—are restricted to issues affecting the title to the property.

¶13    In the real property context, "title" is "[t]he union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property." *Title*, Black's

Law Dictionary (10th ed. 2014); s*ee also* Joyce Palomar, 1 *Patton and Palomar on Land Titles* § 1 (3d ed. 2017) (noting that "[d]ictionaries state that 'title' means the right to or ownership of property," and stating that "title" therefore may "relate either to ownership itself or to the acts, instruments, or records by which ownership has been acquired or by which it may be proven"); 73 C.J.S. *Property* § 48 (2018) (stating that "title" is "that which is the foundation of ownership. . . and . . . which constitutes a just cause of exclusive possession"); 51 Am. Jur. 2d *Liens* § 2 (2d ed. 2018) (stating that "title . . . constitutes the legal right to control and dispose of property").[3] Thus, the plain language of the Policy, as defined by legal dictionaries and encyclopedias, indicates that insurance coverage for "unmarketability of the title" is limited to issues regarding Lauritzen's right to own or possess the property in question.

¶14    Moreover, a restrictive definition of "marketability of title" that limits use of the phrase to issues with ownership or possession of property is consonant with prevailing judicial interpretations of the phrase. In one recent case, a federal appellate court was asked to construe the exact same contractual language at issue here: the same phrase ("unmarketability of the title") and the same internal definition of that phrase. *See Fidelity Nat'l Title Ins. Co. v. Woody Creek Ventures, LLC*, 830 F.3d 1209, 1215–19 (10th Cir. 2016) (applying Colorado law). That court held that "unmarketability of the title" referred to "defects affecting rights of ownership . . . rather than defects affecting the physical condition or use of the covered property." *Id.* at 1218. The court canvassed case law from many jurisdictions, and determined that "the majority view . . . emphasize[s] the differences between marketability of title and marketability of land." *Id.* at 1217 (alterations in original) (citation and internal

---

3. The term "title" is similarly defined in the personal property context. *See, e.g.,* Utah Code Ann. § 41-1a-102(62) (LexisNexis Supp. 2017) (defining "title" in the Motor Vehicle Act as "the right to or ownership of a vehicle").

quotation marks omitted). It quoted a leading insurance treatise, as follows:

> [T]he fact that a given property suffers from 'economic' lack of marketability, which relates to physical conditions affecting the use of the property or other non-title matters, is not relevant to title insurance coverage. In essence, defects which merely diminish the value of the property, as opposed to defects which adversely affect a clear title to the property, will not render title unmarketable within the meaning and coverage of a policy insuring against unmarketable title. This is often expressed by the principle that one can hold perfect title to land that is valueless and one can have "marketable title" to land while the land itself is unmarketable.

*Id.* (quoting 11 Couch on Insurance § 159:7 (3d ed. Supp. 2015)); *see also id.* (stating that "when no reasonably foreseeable challenge to title or to the right of possession and quiet enjoyment of the property can be demonstrated, [the] title will be determined to be marketable" (alteration in original) (citation and internal quotation marks omitted)).

¶15    And we agree with the *Woody Creek* court that most courts draw a distinction between marketability of title, on the one hand, and economic marketability, on the other hand, and limit the concept of "marketability of title" to questions of ownership and possession of property. *See, e.g.*, *Chicago Title Ins. Co. v. Investguard, Ltd.*, 449 S.E.2d 681, 683 (Ga. Ct. App. 1994) (stating that "a difference exists between economic lack of marketability, which relates to physical conditions affecting the use of the property, and title marketability, which relates to defects affecting legally recognized rights and incidents of ownership"); *Whaley v. First Am. Title Co. of Mid-West*, No. W2002-01940-COA-R3-CV, 2004 WL 316978, at *3 (Tenn. Ct. App. Feb. 19, 2004) (noting that a buyer possesses marketable title so long as he

owns the property "free of any competing claims of ownership and free of liens or encumbrances," and holding that an "improper subdivision of Plaintiffs' property does not render the title unmarketable" but rather "constitutes a defect in the physical condition of the property that makes the property economically difficult to sell"); *Sonnett v. First Am. Title Ins. Co.*, 2013 WY 106, ¶ 13, 309 P.3d 799 (Wyo. 2013) (stating that "[a]n individual can hold clear title to a parcel of land, although the same parcel is valueless or considered economically unmarketable because of some restriction or regulation on its use" (citation and internal quotation marks omitted)); *see also* 43 Am. Jur. 2d *Insurance* § 518 (2018) (noting that "[a] difference exists between economic lack of marketability, which relates to physical conditions affecting the use of the property, and title marketability, which relates to defects affecting legally recognized rights and incidents of ownership"); Joyce Palomar, 1 *Patton and Palomar on Land Titles* § 1 (3d ed. 2017) (stating that "a phrase such as . . . 'marketable title' describes the character of one's ownership"). The relevant issues were nicely summarized by the California Supreme Court:

> Although it is unfortunate that plaintiff has been unable to use her lots for the building purposes she contemplated, it is our view that the facts which she pleads do not affect the marketability of her title to the land, but merely impair the market value of the property. She appears to possess fee simple title to the property for whatever it may be worth; if she has been damaged by false representations in respect to the condition and value of the land her remedy would seem to be against others than the insurers of the title she acquired. It follows that plaintiff has failed to state a cause of action under the title policy.

*Hocking v. Title Ins. & Trust Co.*, 234 P.2d 625, 629–30 (Cal. 1951).

¶16    Utah law is not to the contrary. In *Mostrong v. Jackson*, 866 P.2d 573 (Utah Ct. App. 1993), we determined that a landowner's title to a piece of property was not unmarketable merely because it may have lacked "lawful access." *Id.* at 578. We cited a case from another jurisdiction in determining that "access problems do not impair the right to possess property and that only defects related to title as guaranteed to the purchaser *and* affecting market value will render title unmarketable." *Id.* (emphasis added) (citing *Sinks v. Karleskint*, 474 N.E.2d 767, 770 (Ill. App. Ct. 1985)). Thus, the holding of *Mostrong* is entirely in line with the narrow conception of "marketability of title" shared by the vast majority of courts to discuss the issue.[4]

¶17    Despite this, Lauritzen cites hopefully to *Mostrong*, especially to its introductory definition of "marketable title." In

---

4. On a few occasions, our supreme court has referred to the concept of marketability of title. Although the references are often brief and in passing, we are aware of nothing in any of those cases that would lead us to believe that our supreme court espouses a more expansive view of "marketability of title" than our sister states do. *See Kelley v. Leucadia Fin. Corp.*, 846 P.2d 1238, 1243–44 (Utah 1992) (defining "marketable title" as title that may be "freely made the subject of resale and that can be sold at a fair price to a reasonable purchaser," and then determining that a "boundary dispute" affecting the property "constituted a cloud on the title and adversely affected the value and marketability of the property" (citation and internal quotation marks omitted)); *see also In re Hoopiiaina Trust*, 2006 UT 53, ¶ 28, 144 P.3d 1129 (noting in passing that wild deeds could "render[] the property unmarketable"); *Holmes Dev., LLC v. Cook*, 2002 UT 38, ¶¶ 26–29, 48 P.3d 895 (noting that the title company cured an "unmarketability" claim by establishing the title in its insured by litigation); *Booth v. Attorneys' Title Guar. Fund, Inc.* 2001 UT 13, ¶¶ 32–35, 20 P.3d 319 (holding that a bankruptcy arrangement, which did not touch a particular piece of property, did not render title to that property unmarketable).

that case, we stated that title is "marketable" if it "may be freely made the subject of resale . . . at a fair price to a reasonable purchaser or mortgaged to a person of reasonable prudence as security for the loan of money." *Id.* at 577 (internal quotation marks omitted) (quoting *Kelley v. Leucadia Fin. Corp.*, 846 P.2d 1238, 1243 (Utah 1992)). Further, we stated that "[t]he issue of whether marketable title exists may be a question of law or a mixed question of law and fact, depending on the circumstances," and does not depend on "whether title ultimately might be adjudged free of defects" but rather "whether a reasonably prudent [person], familiar with the facts and apprised of the question of law involved, would accept the title in the ordinary course of business." *Id.* at 578 (second alteration in orginal) (citations and internal quotation marks omitted). Lauritzen argues, based on this language, that a jury question is presented in this case as to whether he, as a "reasonable purchaser," would have purchased the Lots had he known in advance about the issues with the Original Plat and the Amended Plat.

¶18   We disagree, at least as to all issues other than the Lot 54 overlap, because in order for the "reasonable purchaser" standard to come into play in the first place, there must be some defect that actually goes to ownership or possession (e.g., title) about which a reasonable purchaser might need to make a decision. In this case, however, the only one of the issues that Lauritzen has identified that has anything to do with the right to own or possess any of the Lots is the Lot 54 overlap issue. With regard to that issue, the overlapping legal description resulted in someone else—the adjoining landowner—having a claim to ownership and possession of at least part of Lot 54, and therefore "title" to Lot 54 was implicated. Because title is placed at issue, it becomes relevant to ask whether a reasonable purchaser would elect not to accept title to Lot 54 if informed of the overlap issue, and we agree with Lauritzen that a jury question is presented on that point.

¶19     All of the non-overlap issues Lauritzen raises, by contrast, concern Lauritzen's right to put the property to various uses, or implicate the convenience with which Lauritzen might be able to develop the Lots. These issues are classic "economic marketability" issues that do not come within the definition of the phrase "unmarketability of the title" of the Lots. Because there are no true "title" issues raised here (other than the overlap issue), it is irrelevant whether or not Lauritzen would have purchased the Lots had he known about potential restrictions on development.

¶20     The Lot 54 overlap issue did implicate the marketability of Lauritzen's title to Lot 54, and to that extent the district court erred by ruling that, as a matter of law, there were no issues that concerned marketability of title. However, all of the other issues Lauritzen raises are not concerns regarding the *title* to the lots, as opposed to the *economic advantage* Lauritzen intended to gain by purchasing them. Accordingly, the district court did not err by granting First American's motion for summary judgment with respect to the rest of Lauritzen's claims that the titles to the Lots were unmarketable.[5]

B.      Title Defects

¶21     Lauritzen also argues that there is coverage under the Policy because he sustained losses as the result of a "defect in"

---

5. First American also alleges, as an affirmative defense, that diminutions in property value caused by governmental property restrictions (e.g., zoning requirements, building permit requirements) were also explicitly excepted from coverage by a policy "exclusion." Because we determine that the economic development issues did not concern the marketability of (or a defect in) Lauritzen's titles and thus were not covered by the Policy in the first place, we have no need to examine whether the language of a coverage exclusion took them further outside the scope of the Policy's coverage.

the title he received by way of the warranty deed. While First American argued in the district court that there was no defect whatsoever in any of the titles conveyed by the warranty deed, First American now concedes that Lauritzen's title to Lot 54 was defective due to the overlap. Thus, at least as far as the Lot 54 overlap issue is concerned, there is now no dispute that a "defect in" the title exists that is covered by the Policy and that would prevent the entry of summary judgment in favor of First American on all of Lauritzen's title defect claims.

¶22 Lauritzen, however, argues that the "defect" in his title is not limited to the Lot 54 overlap issue. Instead, Lauritzen argues that the titles to all five of his Lots were defective, asserting that, because "[t]he [P]lat was expressly incorporated in the [deed's] legal description of all five [L]ots," all of the Lots were subjected to the same "legal claims or disputes," causing the title to all of the Lots to be defective. We are unpersuaded.

¶23 As an initial matter, we agree with Lauritzen's assertion that the Original Plat's description of the Lots was incorporated by reference into the warranty deed. "When lands are granted according to an official plat of a survey, the plat itself, with all its notes, lines, descriptions and landmarks, becomes as much a part of the grant or deed by which they are conveyed . . . as if such descriptive features were written out on the face of the deed or grant itself." *Barbizon of Utah, Inc. v. General Oil Co.*, 471 P.2d 148, 149–50 (Utah 1970). Because the warranty deed referred to the Original Plat to specify the property Lauritzen was purchasing, the Original Plat's description of the Lots became as much a part of that warranty deed as if it was written on the deed's face. This conclusion is especially necessary in cases like this one, where but for the incorporated plat, the warranty deed otherwise contained no description of the boundaries of the Lots.

¶24 However, while Lauritzen is correct about the legal import of the warranty deed's reference to the Original Plat, the implications of this conclusion cut against Lauritzen's argument

that there was some sort of title "defect" regarding the other four Lots. Both parties agree that there has never been any discrepancy or inaccuracy in the manner in which the other four Lots are described in the Original Plat. The physical boundaries of the other four Lots did not change with the recording of the Amended Plat. Because the description of the Lots included in the Original Plat was incorporated into the warranty deed as if those descriptions were written on the face of the deed itself, the deed properly (and without defect) conveyed title to every lot that was accurately described in the Original Plat. *See Ault v. Holden*, 2002 UT 33, ¶ 26, 44 P.3d 781 (noting that "a warranty deed conveys title so long as the deed's description of the property is '*sufficiently definite* . . . to identify the property it conveys'" (ellipsis in original) (quoting *Colman v. Butkovich*, 556 P.2d 503, 505 (Utah 1976)). There is no evidence in the record that, after the conveyance to Lauritzen, any person or entity (other than Lauritzen) claimed an ownership or possessory interest in any portion of the other four Lots. First American is therefore correct in its assertion that, because Lot 54 was the only lot described in the Original Plat that was affected by the overlap, the title to Lot 54 was the only lot conveyed to Lauritzen in the warranty deed whose title was in any way "defective."

¶25    Accordingly, the district court erred when it granted summary judgment in First American's favor on Lauritzen's claim that his title to Lot 54 was defective, but the court did not err in determining as a matter of law that the title to the other four Lots was free of defect.[6]

---

6. Lauritzen also argues that title to his Lots was "vested other than as stated" on the Original Plat, due to the Lot 54 overlap issue. Lauritzen's argument is correct as to the Lot 54 overlap issue, and for reasons elsewhere stated, we herein determine that coverage exists under the Policy for damages caused by the Lot 54 overlap issue. We do not perceive Lauritzen's argument that his title "vested other than as stated" to even apply to any of the

(continued…)

## II. Affirmative Defenses

¶26    While First American acknowledges that Lauritzen's title to Lot 54 was defective, First American raises a number of affirmative defenses, which it contends bar Lauritzen from any recovery under the Policy as a matter of law. Specifically, First American argues that: (1) Lauritzen's claims were untimely because Lauritzen did not notify First American of the title defect until after the Amended Plat was recorded; (2) Lauritzen's consent to the Amended Plat cured the problems with the Original Plat, and thereby mitigated any damages Lauritzen might claim; and (3) Lauritzen failed to present evidence of damages. We find none of these arguments persuasive, at least not as a matter of law on summary judgment.

A.    The Untimeliness Defense

¶27    First American argues that it was entitled to summary judgment because Lauritzen's claims were untimely. First American alleges that Lauritzen violated the terms of the Policy by failing to notify First American of any problem with the Original Plat until after the Amended Plat had already been recorded. First American maintains that this failure to notify First American in a timely manner prejudiced its ability to potentially cure Lauritzen's title problem. Accordingly, First American alleges that its categorical denial of coverage was appropriate. *See State Farm Mutual Auto. Ins. Co. v. Green*, 2003 UT 48, ¶¶ 29–32, 89 P.3d 97 (noting that an insurance company may deny coverage for lack of timely notice if "the insurer [is] prejudiced by" it).

¶28    However, it is undisputed that Lauritzen contacted one of First American's insurance agents regarding the problems with

_____

(…continued)
other development-related issues Lauritzen raises, because they do not have anything to do with vesting of his title.

the Original Plat shortly after learning of the problems himself, and long before the filing of the Amended Plat. While First American asserts that Lauritzen's conversations with its agent were not particular enough to put First American on notice of Lauritzen's claims, it is undisputed that Lauritzen asked to obtain a copy of the Policy, asked First American's agent what was "going on" with respect to the problems with the Original Plat, and received an assurance from First American's agent in a personal meeting that the problem with the plat would be taken care of. In light of this undisputed evidence, it was inappropriate to enter summary judgment in favor of First American on this affirmative defense.

B.    The "Cure" Defense

¶29    First American next argues that it was entitled to summary judgment because Lauritzen's consent to the recording of the Amended Plat "cured" any problem with the Original Plat. However, at oral argument First American conceded that Lauritzen's consent to the Amended Plat would not in fact have obviated all of the damages Lauritzen sustained as a result of the overlap on Lot 54. Because the title to Lot 54 is the only part of Lauritzen's title we have determined was defective and/or unmarketable and therefore covered by the Policy, First American's concession essentially surrenders this defense. Lauritzen's consent to the recording of the Amended Plat did not cure all of the problems occasioned by the defect in the title to Lot 54.

C.    The Damages Defense

¶30    Finally, First American argues that it was entitled to summary judgment because Lauritzen failed to present competent evidence of his damages. A plaintiff is required to establish both the existence and the amount of damages by a preponderance of the evidence. *Stevens-Henager College v. Eagle Gate College*, 2011 UT App 37, ¶ 16, 248 P.3d 1025. While First American does not dispute that Lauritzen has asserted that he

sustained a particular amount of damages, First American alleges that Lauritzen was not qualified to provide an opinion as to the value of his lots, that Lauritzen's damages calculations were incorrect, and that Lauritzen did not include a figure for damages resulting from the defect in title to Lot 54.

¶31    As to the first point, Utah law has long been clear that "an owner of real property who is familiar with his property is competent to give evidence on the market value of that property." *Utah Dep't of Transp. v. Jones*, 694 P.2d 1031, 1036 (Utah 1984). Lauritzen presented evidence that he was familiar with the property. Accordingly, we cannot say as a matter of law that Lauritzen is incompetent to testify as to the market value of the property at the time he purchased it and as to its value after the Amended Plat was recorded.

¶32    As to the second point, disputed factual issues exist as to whether Lauritzen's damages calculations are correct. Certainly, some of Lauritzen's damages estimates may have been rendered obsolete due to our decisions herein regarding the scope of insurance coverage under the Policy. But the extent of appropriate damages for the defect in Lauritzen's title to Lot 54 has not been determined. Because factual disputes about those damages are present, First American was not entitled to summary judgment based on its allegation that Lauritzen's damages calculations were incorrect. *See Hill v. State Farm Mut. Auto. Ins. Co.*, 765 P.2d 864, 868 (Utah 1988) (stating that, where the amount of damages is in dispute, summary judgment is inappropriate), *partially overruled on other grounds by Sharon Steel Corp. v. Aetna Cas. and Sur. Co.*, 931 P.2d 127, 138 n.14 (Utah 1997).

¶33    As to the third point, we disagree with First American as to whether Lauritzen presented sufficient evidence of his damages specific to the defect in his title to Lot 54. Lauritzen presented evidence as to the value of all of his Lots, together, both before and after the recording of the Amended Plat. The latter figure was lower. While a factual dispute may again arise

as to the proportion of the decrease in price which is the result of the defect in Lauritzen's title to Lot 54, it is clear that Lauritzen demonstrated at least some damages caused by the Lot 54 title issues, such that First American is not entitled to summary judgment on damages grounds.

¶34    For the benefit of the parties on remand, we note that Lauritzen is entitled to recover any damages that are caused by the Lot 54 title problem that we have determined is covered by the Policy. There may be different ways in which these damages might have manifested themselves, including potentially reducing the value of Lot 54 due to, among other things, its smaller size. In addition, there may be other categories or theories of damages that Lauritzen might articulate, but all such damages must be linked to the language of the Policy, which obligates First American to pay all "loss or damage" Lauritzen "sustained or incurred by reason of" the Lot 54 title defect.

CONCLUSION

¶35    The district court erred when it granted summary judgment to First American with respect to Lauritzen's claim concerning the title to Lot 54. That issue constituted a defect in title that is covered by the Policy, and First American is responsible for damages Lauritzen sustained as a result of that defect. However, the district court did not err when it granted summary judgment to First American with respect to Lauritzen's claims that his title to the remaining Lots was defective or unmarketable. There is no coverage under the Policy for those claims.

¶36    Accordingly, we reverse the district court's judgment with respect to Lauritzen's claim concerning the defect in his title to Lot 54, affirm the district court's judgment as to all of Lauritzen's other claims, and remand this case for further proceedings consistent with this opinion.

———————