CARL J. BARBIER, UNITED STATES DISTRICT JUDGE
*564 Before the Court is a Motion for Summary Judgment (Rec. Doc. 60) filed by Defendant, Stewart Title Guaranty Company ("STG"). Plaintiff, BJD Properties, LLC ("BJD"), has filed an opposition. (Rec. Doc. 73). Considering the Motion, the record, and the law, the Court finds the Motion should be GRANTED in part and DENIED in part .
FACTS AND PROCEDURAL HISTORY
This is a dispute over STG's obligations pursuant to a Policy of Title Insurance (the "Policy") issued by STG to BJD, covering a parcel of enclosed land. To understand the contract issue at hand, it is necessary to understand the history of the property at the heart of this case. BJD purchased the tract, 27.864 acres of undeveloped land in St. Landry Parish, Louisiana (the "Property"), on December 14, 2006. The sale document, labeled as a "Cash Sale," notes the sellers to be three married couples: John L. Olivier and Julie Ann Brinkhaus Olivier; Joseph F. Olivier and Billie Gay Olivier; and George R. Ramier and Eleanor Olivier Ramier (collectively, the "Oliviers").[1] A plat is attached to the Cash Sale;[2] it shows the 27-acre plot to be a rectangle. (See Appendix). A subdivision, Coteau Lakes Estates, runs along its western boundary. To its east are "Lot 6 John Olivier Partition" and "Lot 7 John Olivier Partition." At the top of the plat, running east-west, is Louisiana Highway 93. Immediately below the highway there is a tract, "Lot 9 John Olivier Partition." Below that there is "Lot 8 John Olivier Partition." The Property lies immediately below Lot 8 of the Olivier partition. Two other tracts of land form the Property's southern border. Thus, the Property does not abut any public roads or utilities; it is enclosed.
The Cash Sale makes no mention of BJD's right of access to the Property. BJD was evidently unconcerned with the issue in 2006 because BJD purchased the Property from the Oliviers with intent to make it the 68-lot "Phase II" expansion of the existing Coteau Lakes subdivision.[3] Buller Juneau Properties, LLC-an entity that, as its name suggests, shares a mostly overlapping membership with BJD-owns Lot 16 of the original "Phase I" development. Lot 16, touching the Property's western border as it does, offers a potential means accessing the Property because one can drive down Grand Lake Drive in Coteau Lakes, onto a dirt road extending through Lot 16, and into the Property.[4] According to BJD, it and Buller Juneau Properties, LLC at some point entered into "an oral servitude agreement" allowing BJD access through Lot 16.[5]
Despite a promising start, "Phase II" never materialized as anticipated. The local real estate market declined, there was a recession, and in 2010 FEMA rezoned the entire Property from Flood Zone "C" to "A," a marked increase in flood risk designation. BJD determined it would not be cost effective to raise the entire Property in order to sell lots in the manner it had planned; instead, BJD decided it would elevate a few large plots and sell those at a *565 higher price point.[6] On November 18, 2015, BJD sold a 12-acre tract on the western side of the Property to Nicholas and Christen Patin for $ 135,000.[7] BJD and the Patins agreed to split the cost of an access road through Lot 16, which would allow the Patins to access their tract and BJD access to the remainder of the Property. BJD began construction of a road through Lot 16 in late 2015.[8]
In January of 2016, the Coteau Lakes homeowners association ("HOA") and certain homeowners in the Phase I development demanded that Lot 16 not be used to access the Property, arguing that such use violated subdivision restrictions-restrictions drafted in part by members of BJD.[9] Although the Policy insured for losses for a lack of right of access, BJD did not inform STG of the developing access dispute.[10] The next month, the HOA and homeowners filed suit against Buller Juneau Properties, LLC in the 27th Judicial District Court of St. Landry Parish, Louisiana. The homeowners sought to enjoin the road construction for violating the subdivision restrictions.[11] On June 28, 2016, the state court agreed with the homeowners that the road construction constituted a "commercial use" of Lot 16-and not a residential use, which was allowed under the restrictions-and granted the injunction.[12]
In a demand letter dated July 12, 2016, the Patins demanded their $ 135,000 purchase price be returned to them due to the apparent lack of access. Two days later, on July 14, 2016, BJD informed STG of the adverse state court decision for the first time and gave notice it intended to file a claim under the Policy.[13] The Policy states:
[STG] insures ... against loss or damage, not exceeding the Amount of Insurance stated in Schedule A [$ 1,050,000], sustained or incurred by the insured by reason of:
1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title;
4. Lack of a right of access to and from the land.[14]
The Policy gives options to STG for how it will resolve title and access issues. For example, pursuant to Section 6(b), STG may pay or otherwise settle with third parties on BJD's behalf, or it may pay or settle with BJD for losses or damages provided for by the policy, including fees and expenses that were authorized by STG.[15] Alternatively, if STG "cures the lack of a right of access to or from the land in a reasonably diligent manner by any method ... it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby."[16] Another provision of the limitation of liability section states STG "shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling *566 any claim or suit without the prior written consent of [STG]."[17]
After BJD filed its claim, STG hired attorney Hansel Harlan to assist BJD in obtaining access to the Property. STG claims that although "Harlan raised alternative access routes that could cure BJD's alleged lack of access, BJD has consistently stonewalled STG's cure efforts."[18]
On September 8, 2016, BJD returned the $ 135,000 purchase price to the Patins without consultation or consent of STG because BJD felt this was the right thing to do.[19] Then, on November 16, 2016, BJD sued STG in state court, claiming it had suffered damages because it has no right to access the Property. STG removed the case to the Western District Court of Louisiana on the basis of diversity jurisdiction.[20] STG then filed a 12(b)(6) motion against BJD, arguing the case should be dismissed because BJD has a right of access pursuant to La. Civ. Code art. 694. Judge Doherty denied the motion by adopting the Report and Recommendation of the Magistrate Judge, which found that although BJD had a claim of right to access pursuant to either La. Civ. Code. arts. 689 or 694, this was not equivalent to an actual right to access the public road.[21] The Magistrate Judge concluded the "property in question is enclosed with no access to a public road."[22] The case was then reassigned to the undersigned judge, and STG filed its motion for summary judgment.
STANDARD OF LAW
Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed. R. Civ. P. 56(c) ), Little v. Liquid Air Corp. , 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co. , 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. Little , 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." Delta , 530 F.3d at 399.
If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.' " Int'l Shortstop, Inc. v. Rally's, Inc. , 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." Id. at 1265.
*567 If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. See Celotex , 477 U.S. at 325, 106 S.Ct. 2548. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. See id. at 324, 106 S.Ct. 2548. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. See, e.g. , id. at 325, 106 S.Ct. 2548, Little , 37 F.3d at 1075.
When examining matters of state law, this Court will employ the principles of interpretation used by the state's highest court. Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC , 620 F.3d 558, 564 (5th Cir. 2010). Mindful of Louisiana's distinction between primary and secondary sources of law, the Court will begin its analyses with reliance on the Louisiana Constitution and statutes before looking to "jurisprudence, doctrine, conventional usages, and equity, [which] may guide the court in reaching a decision in the absence of legislation and custom." Shaw Constructors v. ICF Kaiser Eng'rs, Inc. , 395 F.3d 533, 547 (5th Cir. 2004) (quoting La. Civ. Code. art. 1 rev. cmt. b). If the Court must make an "Erie guess" on an issue of Louisiana law, the Court will decide the issue the way that it believes the Supreme Court of Louisiana would decide it. Id. (citation omitted). This Court is not strictly bound by the decisions of the state intermediate courts and will disregard them if the Court is "convinced that the Louisiana Supreme Court would decide otherwise." In re Katrina Canal Breaches Litig. , 495 F.3d 191, 206 (5th Cir. 2007).
DISCUSSION
What the parties have asked the Court to do in this case is to determine the nature and scope of STG's promise of indemnification to BJD. By the terms of the Policy, in exchange for a small percentage of the purchase price of the land, STG obligated itself to compensate BJD for actual losses resulting from: BJD's ownership of the parcel being other than the tract's description in the Policy's schedule; defective, encumbered, or unmarketable title; or BJD's lack of a legal right to enter or leave the Property by reasonable means.
None of the above coverage obligations amount to a promise that BJD would be able to use the land in exactly the manner that it expected. Nor by undertaking the last coverage obligation did STG promise to provide BJD any particular means of access. The single coverage provision at issue in this case states that "[STG] insures ... against loss or damage ... incurred by the insured by reason of ... [l]ack of a right of access to and from the land."[23] As the Court explains below, any damages resulting from BJD's lack of preferred access are not recoverable. However, as it is undisputed that BJD lacks any access, the Court must decide whether this could result in a diminution in the value of the Property that is covered as a loss under the Policy.
I. ONLY THE RIGHT OF ACCESS COVERAGE PROVISION IS AT ISSUE
Although the Policy explicitly covers for losses sustained by reason of "lack of a right of access to and from the land," BJD insists that the immediately preceding provision indemnifying for losses incurred *568 from "[u]marketabililty of the title" is also triggered. The Court disagrees.
First of all, to read the unmarketability of title provision to subsume protection from losses for lack of right of access would render the last of the four enumerated coverages superfluous. "Louisiana law provides that an insurance policy is a contract between the parties and should be construed using the general rules of contract interpretation set forth in the Louisiana Civil Code." First Am. Bank v. First Am. Transp. Title Ins. Co. , 585 F.3d 833, 837 (5th Cir. 2009). And Louisiana courts typically find interpretations of a contract that render language superfluous to be unreasonable. See, e.g. , Smith v. W. World Ins. Co. , 134 So. 3d 1198, 1200 (La. App. 3d Cir. 2014). While the Louisiana Supreme Court has held that contract language that is ambiguous "must be construed in favor of the insured," the Court does not find this term to be ambiguous. Quinlan v. Liberty Bank and Tr. Co. , 575 So.2d 336, 344 (La. 1990), on reh'g (Mar. 11, 1991). Indeed, it is defined; "unmarketability of the title" is:
[a]n alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.[24]
When the Tenth Circuit considered this language under near-identical facts,[25] it concluded that the unmarketability provision was not triggered because the quoted language refers to "defects affecting rights of ownership-i.e., defects in title-rather than defects affecting the physical condition or use of the covered property." Fid. Natl. Title Ins. Co. v. Woody Creek Ventures, LLC , 830 F.3d 1209, 1218 (10th Cir. 2016).[26] The Tenth Circuit's reasoning in Woody Creek provides a second reason for finding the unmarketability of title provision does not indemnify for lack of a right of access.
In Woody Creek the insured was a subdivision developer who bought two tracts of land separated by another tract of land owned by a third party. Id. at 1210. The developer assumed that it had a right of access between the parcels via a roadway crossing this intervening tract. A prospective buyer of a subdivision lot expressed concern regarding access, and the developer discovered it in fact had no legal right of access through the roadway to the remote parcel. The developer filed a claim against its title insurer, alleging that the lack of a right of access had diminished the *569 value of the remote parcel by $ 7,000,000. While the claim was processed, the buyer backed out of the sale. Id. The insurer filed a quiet title action against the intervening tract owner but dismissed the suit after the insurer was able to negotiate a 30-year revocable right-of-way grant for the developer. Id. at 1210-11.
The developer argued that the temporary right of access left its title unmarketable, as evidenced by the fact that the developer had not been able to sell any of the lots "due to the lack of permanent access." Id. at 1215. The Tenth Circuit acknowledged that the eventual expiration of the right of access made the remote tract less valuable, but the Court determined this loss of value was an issue of the marketability of the land and not the title. Id. at 1217. The Court quoted from a popular treatise for a statement of the rule:
The fact that a given property suffers from 'economic' lack of marketability, which relates to physical conditions affecting the use of the property or other non-title matters, is not relevant to title insurance coverage. In essence, defects which merely diminish the value of the property, as opposed to defects which adversely affect a clear title to the property, will not render title unmarketable within the meaning and coverage of a policy insuring against unmarketable title. This is often expressed by the principle that one can hold perfect title to land that is valueless and one can have "marketable title" to land while the land itself is unmarketable.
Id. (quoting 11 Couch on Insurance § 159:7 (3d ed. Supp. 2015) ). Depending on this distinction, the Court affirmed the district court's opinion that lack of permanent access did not render the insured's title unmarketable, despite a loss of economic value. Id. at 1218.
Although the Tenth Circuit was interpreting Colorado law, the Court's decision was an "Erie guess," based on a line of authority making the same distinction that the Tenth Circuit drew. Id. The Court is not aware of any Louisiana authority contradicting the notion that lack of access is not "a 'defect' in the title to the property." See 11 Couch on Insurance § 159:59 (3d ed. Supp. 2015).[27] Certainly, the parties have not identified any decision by the Louisiana Supreme Court ruling on the issue. Accordingly, the Court is persuaded that the Louisiana Supreme Court would find that an unmarketability of title provision does not provide overlapping coverage with a lack of a right access provision for the same reasons espoused by the Tenth Circuit in Woody Creek.
II. BJD IS ONLY ENTITLED TO ACTUAL DAMAGES RESULTING FROM A LACK OF A RIGHT OF ACCESS
If BJD is entitled to damages, it is through the coverage provision explicitly indemnifying against losses resulting from a lack of access to the Property. Critically, the parties agree that the Property is enclosed; left unresolved is the issue of whether BJD has suffered any compensable losses.
*570 Title insurance policies tend to use the same language and they tend to function in the same manner. They are "agreement[s] to indemnify." Barlow Burke, Law of Title Ins. § 2.01 (3rd ed. 2019 supp.). As the Policy itself recognizes: the "policy is a contract of indemnity against actual monetary loss or damage."[28] This language is intended to signify that the policy is not a guarantee that some contingency insured for will not occur, but that if one does occur, the insurer will compensate its insured for the insured's losses. In the words of Prof. Burke, "An indemnity is thus a collateral contract, by which the indemnitor or insurer agrees to reimburse another (the indemnitee or insured) against a third party's actions." Id. This notion that indemnity contracts require an insurer only to recompense costs compelled by third parties is accepted as a matter of Louisiana law. The Louisiana Supreme Court recognized the limited obligation of an insurer under indemnity contracts when it compared them to general liability policies:
Under a liability policy ... the insurer is required to make payment although the insured has not yet suffered any loss, for by definition the purpose of the liability policy is to shield the insured from being required to make any payment on the claim for which he is liable. Under an indemnity contract, by way of contrast, the insurer is only required to indemnify or make whole the insured after he has sustained actual loss, meaning after the insured has paid or been compelled to make a payment, his action against the insurer then being to recover the amount of such loss by way of indemnity....
The general distinction ... is that if the policy is one against liability, the coverage thereunder attaches when the liability attaches, regardless of actual loss at that time; but if the policy is one of indemnity only, an action against the insurer does not lie until an actual loss in the discharge of the liability is sustained by the insured.
Quinlan , 575 So. 2d 336, 348-49.
As a consequence of their function as indemnity agreements, title policies do not obligate insurers to pay merely because the insured can point to some defect of title it has discovered. Joyce Palomar, 1 Title Ins. Law § 10:8 (2018 ed.). The defect must actually result in a loss. Id. Courts across jurisdictions have struggled with this "actual loss" concept and have come to different conclusions as to what it is and when it occurs. The Seventh Circuit recognized nearly thirty years ago that "the law is thin." Allison v. Ticor Title Ins. Co. , 907 F.2d 645, 652 (7th Cir. 1990).
The law has since filled out some in other jurisdictions but it remains undeveloped in Louisiana. Finding that the Policy at issue in this case is an agreement to indemnify,[29] the Court must still determine whether BJD has claimed "actual losses" that are within the coverage of the Policy and are not subject to a coverage exception or exemption.
a. BJD Cannot Recover Damages Incurred Because BJD Lacks Its Preferred Right of Access
First and foremost, BJD argues the Property has lost value because BJD
*571 has no right of access from Coteau Estates. BJD has obtained two experts who have created reports calculating how much this loss amounts to. Each of these experts is the subject of motions in limine pending before the Court. Kenneth Boagni, III, a civil engineer, generated two Opinions of Probable Cost-line item sheets detailing the costs of installing street and utility improvements for BJD's proposed subdivision.[30] Opinion 1,[31] estimates the cost of building public road and utility access westward through Lot 16: $ 67,343.40. Opinion 2,[32] estimates the costs of building that same infrastructure northward, across the Oliviers' property to Highway 93: $ 345,222.40.
BJD's second expert, Thompson Bradford Core, a professional real estate appraiser, input these estimates into his own expert report[33] in which he appraises the value of Property with access to Coteau Estates and with access to Highway 93. According to Core, if the Property is accessible through Lot 16, it can be developed as a subdivision and the Property's value is $ 327,000.[34] If access must be from Highway 93, then the infrastructure costs estimated by Boagni make a subdivision economically unfeasible, and the Property is only good for recreational or agricultural purposes; its value then is only $ 83,500. It is on the basis these expert opinions that BJD argues it has suffered an actual loss in the amount of $ 243,500.
The Court finds the alleged $ 243,500 diminution in the Property's value is not an actual loss covered under the Policy. BJD is attempting to recover for losses incurred not because BJD lacks access to the Property; rather, BJD assumes STG will obtain an alternate route of access and is asserting it has incurred losses because it does not have its preferred route of access. Typically, title insurance policies insuring a legal right of access "do not insure access by any particular physical route." Palomar, supra , § 5:8 (collecting cases), Burke, supra , § 3.06 ("That the means of access is not what the insured expected or desired, is irrelevant."); see also Woody Creek , 830 F.3d at 1213. In the words of the First Circuit, "read according to its terms, the policy does not cover a lawsuit whose gravamen is the promise of something different from and more valuable than a generic right of access." United Bank v. Chicago Title Ins. Co. , 168 F.3d 37, 39 (1st Cir. 1999).
If the parties intended the Policy to insure a particular right of access, one would expect the Policy would describe that route somewhere in the Policy. Indeed, the Policy includes the attached Schedule A, which describes the Property in basic detail.[35] The first coverage provision of the Policy indemnifies against losses by reason of the "Title to the estate or interest described in Schedule A being vested other than as stated therein."[36] By describing a right of way through Lot 16 in Schedule A and cross referencing it in the right of access coverage provision, the parties could have signified their intent that STG was to indemnify BJD for losses *572 resulting from access not being granted through the described route. In that case the Court could compare the value of the Property with the right of access that had been insured for with the value of the Property with the right of access that BJD in fact has.[37]
However, that is not how the parties contracted. Instead, the Policy states that STG shall indemnify BJD for losses incurred by reason of "[l]ack of a right of access."[38] The indiscriminate "a" signals that the insured will be compensated if the insured suffers a loss because it does not have any legal right to access the Property. The Policy, taken as a whole, makes this point obvious.[39] The limitation of liability section allows that if STG "cures the lack of a right of access to and from the land ... in a reasonably diligent manner by any method ... it shall not be liable for any loss or damage caused thereby."[40] By the terms of the Policy then, STG can satisfy its Policy obligation by simply providing BJD an alternative means of accessing the Property. See Woody Creek , 830 F.3d at 1215 (finding insurer was not liable for subdivision developer's losses because insurer negotiated for a revocable 30-year right-of-way grant). It does not make sense, then, that the Policy would recognize damages incurred because a preferred right-of-way was not available. If STG obtained the right-of-way through the Oliviers' property-which BJD's experts use as a basis for their damages calculations-then STG is not liable for paying any damages to BJD.[41]
To be sure, BJD has suffered a loss because its development plan has fallen through. However, "[BJD's] loss is attributable to some other fortuities concerning [the Property], none of which were insured against by [STG]." In re W. Feliciana Acq., L.L.C. , 744 F.3d 352, 358 (5th Cir. 2014). Thus, the Court holds that BJD cannot recover under the Policy merely because an alternative form of access may require a more expensive investment in infrastructure, even if the infrastructure cost is so expensive so as to prohibit BJD's intended use for the Property.
b. Return of the Patin's Purchase Price
BJD suggests it also suffered actual damages when it returned the $ 135,000 purchase price to the Patins. After an *573 injunction blocked access through Lot 16, the Patins sent BJD a 1-sentence demand later dated July 12, 2016, urging, "Due to access not being granted to the 12 acres we purchased in November 2015, we demand our money back in full at $ 135,000 at your earliest convenience."[42] BJD complied with this demand, evidently because BJD's members felt it was the right thing to do. BJD alleges it financed the $ 135,000 repayment through a mortgage, which has cost BJD $ 11,821.38 in interest payments.[43] BJD does not dispute that it took out the mortgage and returned the $ 135,000 purchase price to the Patins without consulting or obtaining the consent of STG. This is significant because Section 9 of the Policy states STG "shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of [STG]."[44]
BJD asserts that satisfying the Patins' demand for $ 135,000 did not "settle" a "claim" or "suit," therefore, the coverage exception is inapplicable. "Because the policy does not define 'claim,' this court refers to its ordinary meaning." Hartman v. St. Paul Fire & Marine Ins. Co. , 1996 U.S. App. LEXIS 45372, *10 (5th Cir. 1996) (citing Constitution State Ins. Co. v. Iso-Tex , 61 F.3d 405, 407 (5th Cir. 1995) ). In plain English, a "claim" is "a demand for something due or believed to be due (insurance ~)." Merriam-Webster's Collegiate Dictionary 210 (10th ed. 1993). More specifically, a claim is "[a] demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for." Claim , Black's Law Dictionary (10th ed. 2014) (alternatively, an assertion of "any right to payment or to an equitable remedy, even if contingent or provisional"). Thus, by demanding money from BJD the Patins believed they were owed, the Patins made a "claim" upon BJD.
BJD suggests that the Patins' demand was no "claim," because "BJD was under no legal obligation to repurchase the Property." This is a rather incredible argument. BJD is asserting that its insurer should reimburse it for a gratuitous expense that BJD could not be made to pay. This argument flies in the face of the purpose of the "consent to settle" provision in particular and of indemnity contracts in general. The coverage exception exists to "prevent the insured from voluntarily and prematurely assuming responsibility for a loss that may not attach to the insurer." Burke, supra , § 6.18. Even without this applicable coverage exception, the Court questions how a gratuitous payment would constitute an "actual loss" contemplated by the Policy. BJD cannot recover costs it voluntarily expended in returning the Patins' purchase money. BJD should carry the cost of its good deed in place of its insurer.
c. Cost of Developing Lot 16
BJD also states it incurred "expenses for dirt work for the road across Lot 16 ($ 20,000), maintenance expenses ($ 1,100), and plowing costs ($ 1,000) in connection with its preparation to develop the Property beginning in late 2015, as well as 'loss-of-use' damages resulting from its inability to develop it."[45] BJD cites to no provision of the Policy, nor any legal authority, which suggests STG, as title insurer, is liable for these infrastructure or *574 loss-of-use costs. Accordingly, the Court finds them not to be recoverable under the Policy.
d. Litigation Expenses
Finally, BJD claims it has suffered expert, court, and deposition costs in this litigation. As STG notes, these costs are recoverable only if the insured can show that the insurer operated in bad faith in handling a claim on the policy. See La. R.S. §§ 22:1892, 22:1973. In its complaint, BJD summarily alleges that STG acted in an arbitrary and capricious manner in handling its claim; this constitutes bad faith in Louisiana. See La. R.S. §§ 22:1892, 1973.
An insurer does not act arbitrarily or capriciously if it refuses to pay a claim because of a genuine dispute over coverage or the amount of the loss. In re Chinese Manufactured Drywall Products Liab. Litig. , 759 F. Supp. 2d 822, 853 (E.D. La. 2010) (citing Reed v. State Farm Mut. Auto. Ins. Co. , 857 So.2d 1012, 1021 (La. 2003) ). Given that the Court has found that the Plaintiff's asserted losses are not within the scope of coverage of the Policy, STG did not act arbitrarily or capriciously in denying BJD's claim. In any case, BJD has failed to point to any evidence in the record of STG's alleged bad faith.[46] See id.
e. Diminution of Value from Any Lack of Access
Thus, none of the categories of damages enumerated by the insured are recoverable under the Policy. This is perhaps a curious result for a case where the parties agree that (1) lack of access is covered under the title insurance policy, (2) there is a lack of access, and (3) damages can be properly calculated through a diminution of value analysis. Given these three accepted truths, it would seem that the only thing left to do would be to compare the value of the Property with a right to access to the value of the Property without any right to access. Presumably, the difference in these two valuations would approximate the cost of curing the access problem.
Were it so easy. The insurer and insured debate whether the Property's alleged diminution of value constitutes an actual loss at this time. STG argues that it is not yet obligated to compensate BJD because the loss has not yet been realized. STG claims, as have other national title insurers, that pursuant to the "actual loss" limitation, it is not obligated to indemnify BJD for the loss of value of the Property until after BJD has realized the loss by purchasing a right of access or by selling the property at a loss.[47] See Sattler v. Philadelphia Title Ins. Co. , 192 Pa.Super. 337, 162 A.2d 22, 25 (1960) (finding plaintiff could not recover under policy because he did not prove claimed clouds on his title had resulted in actual monetary losses), Eliopoulos v. Nation's Title Ins. of New York, Inc. , 912 F. Supp. 28, 34 (N.D.N.Y. 1996) (accord).
This interpretation of the Policy's language, that "actual loss" occurs only with the expenditure of out-of-pocket payment, has been rejected by a number of jurisdictions. See, e.g. , Miebach v. Safeco Title Ins. Co. , 49 Wash.App. 451, 743 P.2d 845, 846 (1987) (concluding that "actual loss" term is ambiguous and must be construed in favor of the insurer, i.e., more broadly than only out-of-pocket expenses). According to one commentator, the majority rule *575 is "that doubt as to the status of the title can immediately cost an insured owner the freedom to develop, sell, or mortgage property." Palomar, supra , § 6:19. Basically, the insured-friendly construction is that an insured experiences an "actual loss" if a defect or encumbrance would make the property of less value to a potential purchaser of the property. Id.
If the Court were to adopt the out-of-pocket interpretation of "actual loss," the result here would be that although BJD's Property may have lost some value from being enclosed, the loss has not yet realized through some transaction, and STG owes no duty to indemnify. This would not be a finding that STG has discharged its obligations under the Policy, and the Court does not think it would result in "illusory coverage," as BJD suggests. However, it would put the onus on BJD to take some action to realize the loss-either sell the Property or purchase a right of access. At that point, damages could be totaled by simply reviewing the actual money expended to cure or by calculating the difference between the actual sale price and the fair market price of the Property with access. Alternatively, STG could exercise its option to cure the lack of access.
If the Court were to adopt the majority rule, the result would be that BJD may argue at trial that its lack of a right of access has diminished the value of the property. STG complains that it has elected to cure access, but that option is cabined by the requirement that it be performed in a "reasonably diligent manner" and two and a half years past STG's notification of the access problem and BJD still has no legal right of access. Arguably, STG has had fair opportunity to exercise its option already.
The Parties have not cited to any Louisiana case clearly adopting either interpretation and the Court's own survey of Louisiana caselaw has likewise been unfruitful.[48] To the Court, the term "actual loss" is capable of reasonably supporting either construction. See Miebach , 743 P.2d at 846 (finding "actual loss" could mean "out of pocket" losses or "real" losses, i.e. losses that are not merely theoretical). Neither interpretation produces an absurd result. Where ambiguity remains after application of Louisiana's ordinary principles of interpretation, the ambiguity "must be construed in favor of the insured." Quinlan , 575 So.2d at 344 ; see also Peterson v. Schimek , 729 So. 2d 1024, 1029 (La. 1999) (citing La. Civ. Code art. 2056 ). Accordingly, the Court makes an "Erie guess" that the Louisiana Supreme Court would adopt the majority approach: BJD has suffered an "actual loss" if it can prove that the lack of access has caused a diminution in the *576 value of the Property. Diminution in value should correlate closely with the cost to cure the lack of access. See United Bank , 168 F.3d at 41.
III. BJD HAS A RIGHT OF FORCED ACCESS
STG previously moved to have this case be dismissed because, in its words, "BJD has a right to demand a gratuitous servitude of passage over the vendor's adjacent property," by operation of La. Civ. Code art. 694. That article provides:
When in the case of partition, or a voluntary alienation of an estate or of a part thereof, property alienated or partitioned becomes enclosed, passage shall be furnished gratuitously by the owner of the land on which the passage was previously exercised, even if it is not the shortest route to the public road or utility, and even if the act of alienation or partition does not mention a servitude of passage.
The Cash Sale form documenting the Oliviers' sale of the Property to BJD evinces that the Property is bounded on two sides by lots created by the partition of John Olivier's estate (the "Partition").[49] The plat shows that the only northward lands separating the Property from Highway 93 are lots 9 and 10 of the Partition.[50] Thus, it appears that the Property became enclosed through the Partition, and by operation of article 694, the Oliviers must furnish a gratuitous right of passage over their lands to the owner of the Property, BJD.
In her Report and Recommendations, adopted by the Court, the Magistrate Judge recommended that STG's motion to dismiss be denied. Although she recognized that BJD has a claim to a forced right of way under the Civil Code-either by article 694 or article 689 -she found this was not equivalent to an actual right of access.[51] Article 689 states:
The owner of an estate that has no access to a public road or utility may claim a right of passage over a neighboring property to the nearest public road or utility. He is bound to compensate his neighbor for the right of passage acquired and to indemnify his neighbor for the damage he may occasion....
The Magistrate Judge reasoned that "BJD may claim a right of passage over neighboring property, pursuant to La. C.C. art. 689, provided it pays indemnity for the damages it causes" or "pursuant to La. C.C. art. 693, if BJD is able to establish that the passage requested was previously used or exercised prior to the partition."[52] Litigation would be necessary to resolve the issue; thus, the Magistrate Judge concluded that BJD lacked a legal right of access as contemplated by the Policy. Upon further review, the Court agrees that denying dismissal was appropriate. This case is a dispute between a policy holder and its insurer and it would be improper to make a determination of BJD's right to a servitude in this litigation because such a finding would materially impair a property interest held by the Oliviers, who are not party to this proceeding.
Nevertheless, the Court revisits the Magistrate Judge's decision because the Court is not sure it sets out the requirements of art. 694 as the Louisiana Supreme Court would. Both the parties and the Magistrate Judge evidently agreed that art. 694 requires the owner of the dominant estate to prove by what particular *577 route on the subservient estate his property was previously accessed. This is a reasonable position given that the Louisiana Fifth Circuit has held exactly that: "[ Article 694 ] is mandatory and the only requirement is that the passage was previously used or exercised prior to the partition." Bayou Fleet Partn. v. Clulee , 150 So. 3d 329, 336-37 (La. App. 5th Cir. 2014). The Magistrate Judge depended on Bayou Fleet , which depends upon Fuller v. Wright , 464 So. 2d 350, 352 (La. App. 2d Cir. 1985) for this "previous use" requirement. See Fuller , 464 So.2d at 352 ("The only requirement for enforcement of the right is that the right of passage must have been previously used or exercised.").[53] The Bayou Fleet court apparently derived the previous use requirement directly from language in article 694 ostensibly requiring "the passage was previously exercised. " If no passage was exercised previously, there is no passage to be granted gratuitously now, the court reasoned.
Professor Yiannopoulos disagreed with this reading of art. 694 : "The absence of an existing roadway previously used over the transferor's estate does not relieve him of the obligation to furnish a passage gratuitously to the acquirer of the property." 4 A. N. Yiannopoulos, La. Civ. Law Treatise § 5:103 (3rd ed. 2004). An updated version of Prof. Yiannopoulos's revered treatise now states directly that Bayou Fleet "mistakenly" held that that the owner of an enclosed estate must prove the passage requested was previously exercised. 4 A. N. Yiannopoulos, La. Civ. L. Treatise , § 5:22 (4th ed. 2018). Commentators who argue that art. 694 does not require proof of previous use, believe " 'passage' merely refers to a link between the original tract and a public road; it need not refer to a particular, previously used form of access."[54] See Randall L. Wilmore, The Right of Passage for the Benefit of an Enclosed Estate , 47 La. L. Rev. 199, 203 (1986).
Under this interpretation of art. 694, the owner of an enclosed property need not prove that his property was previously accessed by a specific route-however, if such a route was previously used, then the servitude may be fixed along the route without further deliberation. See Patin v. Richard , 291 So. 2d 879, 884 (La. App. 3d Cir. 1974) (interpreting the pre-revision form of art. 694, located at art. 701), Wilmore, Right of Passage, supra , at 203-204; see also Fuller , 464 So.2d at 352. Commentators suggest their reading of art. 694 is *578 in better harmony with two of its underlying purposes.
First, it can reasonably be assumed that in a transaction that would leave a purchaser with an enclosed estate, it is the intent of the parties that the purchaser be able to access his enclosed property from the intervening tract that is retained by the seller.[55] Article 694 codifies this reasonable assumption and makes the consequences of partitions and voluntary alienations predictable and therefore more efficient. Second, as a matter of equity, "a landowner should not be allowed to impose by his own volitional acts the burden of a forced passage on neighboring lands." 4 Yiannopoulos, supra , § 5:103 (3rd ed. 2004). Article 694 internalizes the costs of access to the participants of an alienation or partition. A requirement that there be a previously exercised route of passage externalizes these costs to third-party property owners in cases where two conditions are met: (1) the purchaser of the enclosed estate cannot prove passage previously existed, and so must rely on article 689 ; (2) the neighboring property which affords the shortest distance to the public road belongs to a third-party and not the seller of the enclosed estate. Application of the "previous use" restriction creates unnecessary uncertainty as to how and from whom owners of enclosed estates should seek to force their right of access. Given that the Louisiana Fifth Circuit's "strict adherence to the wording of the article"[56] in Bayou Fleet stands in opposition to the purposes of the article, the Court is not persuaded that the Louisiana Supreme Court would find that art. 694 imposes a "previous use" proof requirement.
Thus, it may be that whether or not BJD has evidence of "previous use" of a passage over the Oliviers' land, BJD may be entitled to a gratuitous right of passage under art. 694. Of course, the Louisiana Supreme Court might well agree with Bayou Fleet , and so might any district court in which BJD or STG took their claim of access. But even if article 694 does impose a previous use requirement, and no previous use can be shown, the worst-case scenario would be that BJD is entitled to a forced right of passage for compensation. Article 689 effectively acts as a backstop in this case, capping the cost of curing access. The determination of this cost to cure and the correlative diminution in value of the property is left to the trier of fact-that is, unless the insurer satisfies its obligations under the Policy by curing the access problem.
CONCLUSION
To sum up, the Policy is a contract of indemnity requiring STG to compensate BJD for actual damages incurred from a lack of a right of legal access. Losses from a lack of access are not covered under the unmarketability of title coverage provision. Losses incurred because a preferred right of access is not available are not recoverable. STG has not acted in bad faith and litigation expenses are not recoverable. BJD has suffered an "actual loss" if the value of the property has diminished because it lacks any legal right of access.
Accordingly,
IT IS HEREBY ORDERED that the Motion for Summary Judgment (Rec. Doc. 60) is GRANTED as to Plaintiff's claims for damages incurred from:
(1) BJD's lack of preferred right of access;
*579 (2) BJD's return of the Patin's purchase price;
(3) BJD's investment in infrastructure or from loss of use;
(4) BJD's expenses as a part of this litigation.
IT IS FURTHER ORDERED that the Motion is DENIED to the extent Plaintiff asks for damages from the diminution of value of the property because it lacks any legal right of access.
APPENDIX

(Rec. Doc. 60-2 at 1).

(Rec. Doc. 60-2 at 4).

(Rec. Doc. 73 at 10-13).

(Rec. Doc. 73 at 11).

(Rec. Doc. 73 at 13).

(Rec. Doc. 73 at 12).

(Rec. Doc. 73 at 13).

(Rec. Doc. 73 at 13).

(Rec. Doc. 60-1 at 4).

(Rec. Doc. 60-1 at 4).

(Rec. Doc. 60-1 at 4).

(Rec. Doc. 60-9).

(Rec. Doc. 60-1 at 5).

(Rec. Doc. 60-3).

(Rec. Doc. 60-3 at 2).

(Rec. Doc. 60-3 at 3).

(Rec. Doc. 60-3 at 3).

(Rec. Doc. 60-1 at 5).

(Rec. Doc. 60-1 at 5).

(Rec. Doc. 1).

(Rec. Doc. 21 at 7).

(Rec. Doc. 21 at 8).

(Rec. Doc. 60-3 at 1).

(Rec. Doc. 60-3 at 2).

One difference between this case and Woody Creek , is that STG has not yet actually obtained even a temporary right of access for BJD. This distinction might be significant were it not for the fact that BJD is apparently uninterested in obtaining an alternative right of access and has allegedly "stonewalled" STG's requests that the entities work together to find a new means of access. As BJD's filings make clear, BJD, like the developer in Woody Creek , is interested in using an already developed point of access because any alternative right of access would make its planned subdivision economically unfeasible.

Under Louisiana law, merchantable title is "free of rational substantial doubt to the extent that a purchaser should feel that he can hold his purchase in peace without the probability of attack and with reasonable assurance that it will be readily salable on the open market." Deleon v. WSIS, Inc. , 728 So. 2d 1046, 1049 (La. App. 2d Cir. 1999). This is entirely consistent with Colorado's definition of merchantability of title, which the Tenth Circuit used in Woody Creek, 830 F.3d at 1216 ("A marketable title as one that is 'reasonably certain not to be called into question in the future so as to subject the purchaser to the hazard of litigation.' ").

The Court concedes that another treatise has surveyed existing case law and come to the opposite conclusion. See Joyce Palomar, 1 Title Ins. Law § 5:8 (2018 ed.) ("[E]ven if a particular title insurance policy does not expressly cover loss resulting from lack of a right of access, the Insured may have a claim for unmarketability of its title."). However, as that commentator admits, "[t]he fact that in ALTA policies, separate Covered Risks exist for unmarketability of the title and lack of a right of access does suggest that title insurers did not intend that lack of a right of access necessarily was included within the policy's coverage for unmarketable title." Id.

(Rec. Doc. 60-3 at 3).

"In general, the class into which a particular policy falls depends upon the intention of the parties to the contract, as evinced by the phraseology of the agreement in such respect in the policy." Quinlan , 575 So. 2d at 348. Here, the language stating the "policy is a contract of indemnity against actual monetary loss or damage" compels the conclusion that the Policy is one of indemnity.

(Rec. Docs. 71-2, 72-3).

(Rec. Docs. 71-2).

(Rec. Docs. 71-3).

(Rec. Doc. 70-2).

(Rec. Doc. 70-2 at 55-57).

"A certain tract or parcel of land, together with all buildings and improvements thereon, and all rights, ways, privileges, servitudes, appurtenances, and advantages thereunto belonging, containing 27.864 acres, more or less, located in ... St. Landry Parish, Louisiana...." (Rec. Doc. 60-3 at 4).

(Rec. Doc. 60-3 at 1).

This type of diminution of value analysis can be seen in Spalding v. Stewart Title Guaranty Co. , 463 S.W.3d 770, 777 (Mo. 2015) (en banc), a case BJD relies on. In Spalding , the insured's claim was for a defect in title. According to the schedule attached to the title policy, the insured had title to 419 acres of land; in fact, a rival claimant had title to one of these acres. Id. at 772. In that case, STG attempted to recompense the insured for the fair-market value of the 1-acre: $ 10,000. Id. at 774. The insured refused this offer because the insured had planned to use its entire parcel to create a lakefront subdivision with an artificial lake, and the rival-claimant was a hold-out, asking for $ 387,000. In lieu of covering its damages, the insured asked that STG cure its title, but STG refused to do so. Id. The Missouri Supreme Court affirmed a $ 1 million-dollar verdict. Spalding is distinguishable not because it involved a title defect but because the policy in that case insured a specific 419-acre tract, and the insurer had good title to a tract other than how it was described in the policy. This case would be analogous to Spalding if BJD had contracted for deeded access to the Property.

(Rec. Doc. 60-3 at 1) (emphasis added).

"Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050.

(Rec. Doc. 60-3 at 3).

This might explain why BJD has not been eager to have STG secure an alternative right of access.

(Rec. Doc. 73-14).

(Rec. Doc. 73 at 22).

(Rec. Doc. 60-3).

(Rec. Doc. 73 at 22).

To the contrary, the record reflects that STG has attempted to satisfy its obligations under the Policy from the beginning by curing the lack of access through an alternative route. (Rec. Doc. 60-13).

Or, after reasonable efforts, if the insured is unable to sell the property because of a lack of access.

BJD relies on the law of other jurisdictions. STG cites to two cases applying Louisiana law, but neither reaches the issue of whether a diminution in the value of a property constitutes an "actual loss." In Ky v. GOB Const., Inc. , No. 2013-1042, 2014 WL 1717454 (La. App. 3 Cir. April 30, 2014), the homeowner did not argue his property had been devalued for violating a local ordinance; in fact, he freely admitted "he had[n't] suffered any loss." The second case is distinguishable because it involves a lender's insurance policy rather than an owner's policy. See First Nat. Bank of Jeanerette v. Lawyers Title Ins. Corp. , No. CIV. 08-0913, 2010 WL 3734056, at *1 (W.D. La. Aug. 12, 2010), report and recommendation adopted , No. CIV. 08-0913, 2010 WL 3734020 (W.D. La. Sept. 16, 2010). The Fifth Circuit has recognized in dicta that "the owner of property suffers a loss immediately upon discovery of a defect." First Am. Bank v. First Am. Transp. Title Ins. Co. , 759 F.3d 427, 433 (5th Cir. 2014). A mortgagee, by contrast, does not. Id. See Palomar, supra , §§ 6:19-20 for a detailed examination of how the differences between owners' and lenders' interests has created different rules for determining what constitutes an "actual loss" for insured owners and lenders.

(Rec. Doc. 60-2 at 1).

(Rec. Doc. 60-2 at 4).

(Rec. Doc. 21 at 7).

(Rec. Doc. 21 at 7).

In Fuller the court held, "Having shown that a definite roadway existed and had been used before and after the 1962 partition, these plaintiffs are and have been entitled to the exercise of their CC Art. 694 servitude rights." Fuller , 464 So.2d at 352. This made it unnecessary to "fix the location of the servitude before granting an injunction." Id. The court therefore did not "answer the question as to what relief an owner of a dominant estate may seek if a passageway does not exist at the time of the partition or alienation." Randall L. Wilmore, The Right of Passage for the Benefit of an Enclosed Estate , 47 La. L. Rev. 199, 210 (1986).

This interpretation finds some support in the structure of the article. The first part of art. 694-as indicated by the use of the word "when,"-states the conditions necessary for it to be applied (property is enclosed by partition or by voluntary alienation). The second part states the consequences of art. 694's application: "passage shall be furnished gratuitously by the owner of the land on which the passage was previously exercised." (emphasis added). The third part simply affirms that art. 694 is not constrained by the general article setting the locations of passages, art. 692 (art. 694 provides a right of passage "even if it is not the shortest route to the public road or utility"). The fourth part similarly affirms that article 694 applies even if the act of partition or alienation does not mention any servitude of passage. It is a strange construction which places an additional requirement for application of the article in the second part, rather than the first.

See 4 Yiannopoulos, supra , § 5:103 (3rd ed. 2004).

See Stuckey v. Collins , 464 So. 2d 346, 348 n.3 (La. App. 2d Cir. 1985).